Docusign Envelope ID: 1F83EEA6-4D99-46E4-B7CD-805BB126ABBB

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CLASSIC RECREATIONS – TEXAS, LLC,[1] | § | Case No. 25-32572-mvl11V |
| | § | |
| | § | Subchapter V |
| Debtor. | § | |

**DECLARATION OF PETE VANDERVEEN, TURNAROUND OFFICER, IN SUPPORT OF CHAPTER 11 PETITION AND FIRST-DAY MATTERS**

I, Pete Vanderveen, hereby declare as follows:

1. "My name is Pete Vanderveen. I am over the age of eighteen years, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to make this Declaration. The factual matters set forth herein are within my personal knowledge and are true and correct.

2. I am the turnaround officer for Classic Recreations – Texas, LLC (the "Debtor"), a company organized under the laws of the State of Texas, and I have been designated as the responsible party to act for the Debtor pursuant to the appropriate corporate resolution. I am familiar with the Debtor's operations, including its financial affairs, prepetition fundraising efforts, and its books and records.

3. I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that compelled the filing of the Debtor's chapter 11 subchapter V bankruptcy case (the "Bankruptcy Case"), and to support the Debtor's requests for relief on various motions and requests for relief filed contemporaneously with this Declaration. Except as otherwise

---

[1] The Debtor in this chapter 11 subchapter V bankruptcy case, along with the last four digits of its federal tax identification number is: Classic Recreations – Texas, LLC (4967). The Debtor's mailing address is: 3151 Justin Road, Flower Mound, Texas 75028.

DECLARATION OF PETE VANDERVEEN, TURNAROUND OFFICER, IN SUPPORT OF CHAPTER 11 PETITION AND FIRST-DAY MATTERS – PAGE 1

indicated, the statements in this Declaration are based upon my personal knowledge, discussion with the Debtor's management, officers, and advisors, a review of the Debtor's books and records, and/or opinions based on my experience and knowledge in the business.

4. I graduated from the University of Alberta with a degree in Business and Managerial Economics in 2002. I began my career in the Oil and Gas industry advising companies globally on directional drilling and oil and gas exploration optimization. Specifically, I advised companies on lowering costs and creating a more efficient business model to drive profits and growth for the business.

5. After working for a decade in the oil and gas industry, I spent a year advising the Loon River Group of Companies on its sweeping change in management. During the shift in management, I was tasked with overseeing the fiscal and operational health of the companies to preserve the value of the companies for the new management group.

6. Next, I co-founded a fitness brand which achieved significant growth and opened thirty-four (34) fitness studios in just 18 months. During this time I also founded AMPT Growth Partners ("AMPT"). I am currently the CEO of AMPT. AMPT is a growth and scaling partner which helps both stable and distressed businesses obtain growth capital to grow the health and reach of the business. AMPT has had significant success in the manufacturing and technology space representing dozens of companies and achieving significant growth by cutting costs and renegotiating debt.

7. In November of 2024, the Debtor engaged me through AMPT growth partners to advise on its growing cash-flow and debt problems. As set forth in more detail below, I helped the Debtor engage in a robust marketing and fundraising process prior to the Petition Date. After exhausting all options, the proposed sale process through this Bankruptcy Case represents the sole

method by which to achieve the highest and best recovery for the Debtor's creditors, and preserve the value of the Debtor's assets.

## THE DEBTOR'S OPERATIONS

A.  **Background and Operations**

8. For nearly two decades, the Debtor has produced high-performance American muscle cars for track enthusiasts and car collectors. The Debtor's main business line is a custom made replica of the original Shelby GT line from 1964 through 1968. The Debtor custom builds each car, taking up to 1,800 man hours per car, to craft a sportscar which both honors the legacy of the Shelby GT and provides the Debtor's customers with cutting edge racing technology. In addition, the Debtor manufactures other muscle cars including more modern Shelby GT500 models, Chevrolet Camaros, and Ford Mustangs.





B. **Events Leading to the Bankruptcy Case**

9. Bryan Stone, the Debtor's CEO, purchased the business through an asset-only sale with his brothers in the spring of 2020 (collectively, the "Principals"). At that time, the Debtor had been keeping all of its accounting, orders, vendor obligations, and other financial records on paper without the assistance of a computer system. While it was disclosed that the Debtor was not as financially healthy as it could be, the Debtor's lack of adequate record keeping concealed the true severity of the Debtor's financial distress, which Bryan Stone and his family only discovered after acquiring the Debtor and updating its books and records to an appropriate online system.

10. From 2020 to 2023, the Debtor worked to update its accounting system as well as reduce expenditures and increase revenue to rehabilitate the Debtor's health as a going concern. During this time, the Principals, through capital contributions and loans, covered the Debtor's cash shortfalls to pay for wages, bills, utilities, and vendor payments.

11. Shortly after the acquisition of the Debtor, COVID-19 occurred. The COVID-19 pandemic had a significant impact on raw material costs, with steel and alloy components as well as carbon fiber parts doubling or tripling in cost during the pandemic. These prices have not fully abated and remain significantly higher than their pre-pandemic levels. The Debtor was therefore saddled with a significant amount of legacy contracts to manufacture cars from 2020 which were priced based on market prices for components and carbon fiber in 2020. With the significant inflation during the pandemic these contracts became unprofitable meaning the Debtor would lose money on each pre-pandemic contract. Many of these contracts were contracts that new management inherited when the business was acquired.

12. By early 2024, the Principals had exhausted their own cash resources and needed to achieve a rebalancing of the Debtor's financials in order for the business to survive.

Accordingly, in 2024 the Principals sought a strategic partner, either through a capital raise or debt financing, to finance the existing contracts and satisfy the Debtor's obligations to customers and give the Debtor the ability to complete new profitable contracts.

C.  **Prepetition Fundraising and Refinancing Efforts**

13. In early 2024, the Debtor attempted to obtain a broad refinancing of its obligations and injection of capital by approaching several banks for traditional financing. The Debtor was unable to attract any interest from banks or other traditional lending institutions causing the Debtor to turn to investors and other sources of capital.

14. From February to May of 2024, the Debtor conducted extensive outreach to prospective investors. In June of 2024, the Debtor hired an investment and advisory group to help raise capital (not AMPT). The advisory group marketed the Debtor for equity investments at a $30 million valuation to parties interested in fractional ownership of the Debtor. The advisory group advised that an equity raise at a $30 million valuation would be the most attractive path forward for the Debtor, and would be the most likely way to achieve a successful equity raise. However, due to the volatility in the investment market in 2024, which impacted manufacturing significantly, investors were unwilling to invest in the Debtor at a $10, $15, or $30 million valuation. In October of 2024, the Debtor realized that the advisory firm's strategy was not going to yield results, and terminated its relationship with the advisory firm.

15. In November of 2024, the Debtor retained AMPT as a turnaround and investment strategist. AMPT designed a financial turnaround strategy aimed at giving the Debtor instant liquidity through convertible promissory notes, and capping the fundraising with a large investment which would rebalance the Debtor's balance sheet, eliminate debt, and put the Debtor on a better financial path.

16. In January of 2025, the Debtor implemented its strategy. The Debtor held investor events where it showcased its vehicles and shop to high net worth car enthusiasts. The Debtor also met with several high net worth individuals and investment groups to produce interest in being part of an investment group in the Debtor. AMPT ran this process at a lower valuation than the valuation the Debtor's former advisory group used. Despite the changes to the Debtor's strategy, the Debtor was only able to secure three investors which would have given the Debtor a longer runway to reorganize its affairs, but which did not provide the Debtor with sufficient liquidity to achieve a full turnaround. During this time, the Debtor was also unable to obtain new secured or unsecured funding for its business. Accordingly, in April of 2025, the Debtor's path narrowed, leaving a sale as the only likely viable option to preserve the going concern of the business for all stakeholders.

17. In April and May of 2025, the Debtor was approached by a competitor regarding a potential sale transaction. The competitor did not have sufficient liquidity to purchase the Debtor's assets through a bankruptcy process, but proposed to attempt an out of court sale. Ultimately, the competitor was simply unable to bring enough money to the table, and as a result, the proposed transaction did not come to fruition.

18. In May of 2025, the Debtor met with the owners of CR Turnaround LLC (the "Purchaser" or "Stalking Horse Purchaser") for the first time. The Purchaser, a UK company, has experienced significant success in the exotic truck manufacturing space over the last several years and is in the process of rolling up the assets of several American car manufactures to become a global exotic and muscle car manufacturing powerhouse. Prior to the Petition Date, the Purchaser and the Debtor executed that certain *Asset Purchase Agreement* dated as of July 9, 2025 (the "APA"), to achieve a sale of all the Debtor's assets for a total purchase price of $1,200,000 (the

"Purchase Price," which is contemplated to be a credit bid of up to $300,000 with the residual amount being paid in cash at closing). After marketing the Debtor and its assets for over a year, the Purchase Price is the highest and best offer that the Debtor has received, and is contingent on the Stalking Horse Purchaser's ability to fund the Bankruptcy Case and credit bid those funds against the Purchase Price.

19. There are no other options for the Debtor. Absent the approval of the APA the only other option is a liquidation, which would result in a significant loss of value in the Debtor's assets, a loss of jobs, and ultimately a much smaller return to the Debtor's creditors.

20. The proposed sale is the only course of action that leaves a potential recovery for unsecured creditors. Depending on the claims administration process and ongoing settlement discussions with key creditors, there may be a return to unsecured creditors if the sale closes as proposed. In a liquidation, unsecured creditors are unlikely to receive any recovery.

**D.     The Debtor's Obligations**

21. or about April 7, 2022, the Debtor executed that certain *Promissory Note* (the "First HW Note") with Hancock Whitney Bank ("HW Bank") in the principal amount of $500,000. On that same date, the Debtor executed that certain *Commercial Security Agreement* (the "HW Security Agreement") granting HW Bank a security interest in all assets of the Debtor whether owned or later acquired. On April 18, 2022, HW Bank recorded its UCC-1 financing statement numbered 22-0019881506 (the "HW Financing Statement") with the Texas Secretary of State describing HW Bank's interest in the Debtor's assets. On or about July 31, 2024, the Debtor executed that certain *Promissory Note* (the "Second HW Note") with HW Bank in the principal amount of $519,460.33 which replaced the First HW Note. Additionally, on or about February 17, 2025, the Debtor executed that certain *Promissory Note* (the "Third HW Note") with HW Bank

in the principal amount of $499,536.41. As of the Petition Date, the Debtor owes total outstanding obligations to HW Bank in the amount of $1,077,116.74.

22. On or about May 23, 2023, the Debtor entered into that certain Employee Retention Tax Credit Term Loan (the "ERC Loan") with Cross River Bank as the lender, and Itria Ventures LLC ("Itria") as the loan servicer. Under the ERC Loan, the Debtor borrowed $719,251.00 against its future Employee Retention Tax Credit (the "ERC Credit") which was to be paid back with interest only payments for twelve months and then twenty-four months of principal and interest payments. On that same date, a UCC-1 financing statement numbered 23-0022706830 (the "ERC Financing Statement") was recorded, describing an all asset lien on the Debtor's assets, and specifically describing the ERC Credit proceeds as collateral. Upon information and belief, the ERC Financing Statement belongs to the ERC Loan giving Cross River Bank a second lien position on substantially all of the Debtor's assets.

23. On or about June 14, 2024, the debtor executed that certain Receivables Purchase Agreement (the "Credibly MCA Loan") with Credibly. Under the Credibly MCA Loan, Credibly advanced $250,000.00 for an immediate obligation for the Debtor to pay Credibly $333,750. While the Credibly MCA Loan provides Credibly with a security interest in all assets of the Debtor, Credibly did not file UCC-1 statement with the Texas Secretary of State. The Credibly MCA Loan is secured but unperfected. Credibly is therefore in third lien position on substantially all of the Debtor's assets, but the lien is avoidable.

24. Later in 2024, the Debtor sought to refinance the ERC Loan. The Debtor turned to Itria (together with HW Bank, and Credibly, the "Prepetition Secured Lenders"), the ERC Loan servicer, for cash.

25. Itria is an opportunistic merchant cash advance lender. As is typical of small businesses which experience financial distress, Itria knew that the Debtor had nowhere else to turn, and so Itria took advantage of the Debtor. On or about September 30, 2024, the Debtor executed that certain Receivables Sale Agreement (the "Itria MCA Loan"). Itria provided sufficient liquidity to retire the ERC Loan and stepped into the shoes of the Lender under the ERC Loan. Upon information and belief, Itria also filed a UCC-1 financing statement numbered 24-0054927396 (the "Itria Financing Statement") describing an all assets lien in the Debtor's collateral.

26. The Itria MCA Loan imposed an immediate obligation on the Debtor to pay a $644,000 obligation in return for only $460,000 in funds advanced. On day one of the Itria MCA Loan, the Debtor became obligated on $184,000 in interest. Itria, as loan servicer on the ERC Loan, knew the Debtor's financial condition and actively took advantage of the Debtor in making the Itria MCA Loan. Accordingly, the Itria MCA Loan is plainly usurious because of the exorbitant interest charged to the Debtor on the first day of the loan's existence. Additionally, the Debtor has taken the position that the Itria MCA Loan is avoidable as a fraudulent transfer pursuant to section 548 of the Bankruptcy Code and section 24.001 *et seq.* of the Texas Uniform Fraudulent Transfer Act.

27. As a result of the transactions above, the Debtor's assets are encumbered as follows:

| | |
|---|---|
| Hancock Whitney Bank | $1,077,116.74 |
| Itria Ventures LLC | $ 642,075[2] |
| Credibly | $ 282,211[3] |

---

[2] Contingent, Disputed, and Unliquidated.
[3] Unperfected.

DECLARATION OF PETE VANDERVEEN, TURNAROUND OFFICER, IN SUPPORT OF CHAPTER 11 PETITION AND FIRST-DAY MATTERS – PAGE 9

The Debtor holds claims against Itria rendering its claim disputed, contingent, and unliquidated, and the Debtor's estate likely has a superior right on the assets of the estate than Credibly.

## THE FIRST-DAY MOTIONS

28. Concurrently with the filing of this Bankruptcy Case, the Debtor has filed various first-day motions (the "First-Day Motions") requesting certain relief on an expedited basis. The First-Day Motions seek to protect and preserve the value of the Debtor's assets while the Debtor operates and completes a sale process for its assets. In furtherance of that goal, the Debtor seeks interim and final approval to enter into a postpetition super-priority financing arrangement with the Stalking Horse Purchaser to ensure that the Debtor has sufficient cash to pay its employees and preserve its assets. Next, the Debtor intends to conduct an auction process with the Stalking Horse Purchaser to maximize the value of the Debtor's assets for the benefit of the Debtor's creditors.

29. I believe that the relief requested in each of the First-Day Motions is appropriate and tailored to protect and preserve the estate by, among other things, ensuring an orderly transition into the sale process.

**A.    Emergency Consideration**

30. The proposed transaction with the Stalking Horse Purchaser within thirty (30) days of the Petition Date is the best path to achieving the highest and best return for the Debtor's assets. Prepetition, the Debtor exhausted all avenues of fundraising and refinancing available to the Debtor. Moreover, even with the proposed DIP facility, the Debtor does not have liquidity to maintain the value of the Debtor for more than thirty (30) days. The Stalking Horse Purchaser's offer contemplates a swift sale process because, as part of the value proposition, the Stalking Horse Purchaser will want to engage with the Debtor's vendors and customers as soon as closing occurs. Any significant delay in the sale process will erode that value proposition – vendors will be less

likely to negotiation, customers sentiment will turn, and the overall value of the operation will deteriorate.

31. Emergency consideration of the First-Day Motions is necessary to avoid immediate and irreparable harm to the business, employees, and its creditors. The Debtor simply cannot complete the sale process without the benefit of the proposed debtor-in-possession financing, and if the Debtor cannot complete the sale process then it will lose the overwhelming majority of the value in its assets. Therefore, the Debtor respectfully requests emergency consideration of the Wage Motion, DIP Motion, and Bid Procedures Motion (as defined below) to preserve the value of its assets to achieve the highest and best sales price for the same.

**B.     Debtor's Emergency Motion for Entry of an Order Authorizing Payment of Prepetition Employee Wages (the "Wage Motion")**

32. The Debtor pays its employees bi-weekly in arrears. The Debtor timely made payroll for the pay period ending on June 28, 2025. As of the Petition Date, the Debtor is obligated to its employees for the period from June 30, 2025 through the Petition Date. The Debtor seeks Court approval to pay any accrued unpaid prepetition wage obligations when they become due. The Debtor estimated that it will incur wage and withholding obligations in the amount of $45,000.00 for prepetition wages and withholding.

33. The Employees are essential to preserving the Debtor's assets and closing the anticipated sale. The Employees are already operating on reduced hours. The Employees live, for the most part, paycheck-to-paycheck and if the Debtor cannot pay the Employees then the Employees will likely leave the Debtor which will cause immediate and irreparable harm to the Debtor's assets. Further, maintaining the core team and Employee morale is very important for the Purchaser, and failing to pay the Employees would damage that morale and jeopardize the sale.

Accordingly, the Debtor submits that paying the Employees' priority claims is the best path forward in the Bankruptcy Case.

34. The Debtor maintains several health and welfare benefits plans for eligible employees, including for medical, dental, and vision care coverage (the "Health and Welfare Benefits"). As of the Petition Date, the Debtor does not believe it owes any prepetition obligations on account of the Health and Welfare Benefits but seeks permission to maintain the same out of an abundance of caution. Failure to continue the Health and Welfare Benefits could cause employees to experience severe hardship and make it difficult to retain the workforce. It is essential for the Debtor to continue providing the Health and Welfare Benefits to their employees in order to maintain morale and the health and safety of their employees. It is thus critical that the Debtor stays current with the benefits providers. Moving to alternative benefits providers would be impracticable and costly.

**C. Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief (the "DIP Motion")**

35. The Debtor seeks to enter into postpetition financing for the principal sum of $300,000 by and through certain lending agreements with the DIP Lender. The Debtor believes that the proposed DIP Facility represents significantly better-than-market terms to the Debtor, including a market interest rate, no fees, and no scheduled interest or principal payments due during the applicable term. Importantly, the DIP Facility is unsecured and the Debtor could not otherwise obtain unsecured financing. The DIP Lender is also a proposed "stalking horse" purchaser of substantially all of the Debtor's asset at a proposed purchase price that, if realized, will be sufficient to pay all of the Debtor's undisputed secured creditors in full (the "Stalking Horse Bid"). The DIP Facility is vital to maintaining the value of the Debtor's assets. Without the DIP

Lender's willingness to infuse new capital into a struggling business, the Debtor would be forced to liquidate its assets at a much lower valuation.

36. Accordingly, the Debtor requests the entry of interim and final orders providing for, among other things:

- authorizing the Debtor to obtain postpetition financing on a super-priority basis from the DIP Lender in the aggregate principal amount of $300,000 consisting entirely of "new-money" financing during the Bankruptcy Case;

- authorizing the Debtor to enter into, execute, deliver, and perform under the DIP Facility and all related agreements or documents creating, evidencing, or securing indebtedness, or obligations of the Debtor to the DIP Lender described in the DIP Facility;

- approving the terms and conditions of the DIP Facility;

- granting allowed super-priority administrative claims to the DIP Lender with respect to the DIP Facility under section 364(c)(1) of the Bankruptcy Code;

- modifying the automatic stay of section 362 of the Bankruptcy Code to the extent necessary to comply with the relief requested in this Motion and as set forth in the DIP Documents;

- waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order;

- finding the DIP Lender a "good faith" lender under section 364(e) of the Bankruptcy Code and granting all protections afforded therein;

- scheduling a final hearing within thirty (30) days from the Petition Date and approving notice with respect thereto in accordance with Bankruptcy Rule 4001(b) and (d); and

- entering the Final Order approving the relief granted in the Interim Order.

37. I believe that approval of the DIP Facility and authorization of use of Cash Collateral, for all of the enumerated reasons set forth in the DIP Motion, affords the Debtor the best opportunity to maximize value for creditors and parties-in-interest.

38. As described above, for a year before the Petition Date, the Debtor engaged in a robust process to market the Debtor to institutional lenders, private lenders, and high net worth investors. No traditional lender would extend the Debtor credit and the Debtor also failed to locate a private lender which would advance funding on an unsecured basis. The Debtor also could not source enough equity investors to reorganize the Debtor's affairs and rebalance the Debtor's obligations in the prepetition period. Accordingly, the DIP Facility is the only possible source of unsecured financing for the Debtor, and is therefore in the Debtor's reasonable business judgment.

D.  **Debtor's Emergency Motion for Approval of (A) Bid Procedures, and (B) Stalking Horse Protections (the "Bid Procedures Motion")**

39. In order to maximize value for all creditors, the Debtor has determined to engage in a competitive and open auction process (the "Bid Procedures") for the sale of substantially all of their assets, with the Stalking Horse Purchaser serving as stalking horse.

40. The Bid Procedures provide for bidders to meet certain minimum qualification, including with respect to having sufficient corporate authority and financial wherewithal to enter into a sale transaction on terms similar to the APA. Additionally, qualified bids which may trigger an auction require the qualified bidder to pay a 10% good faith deposit of the proposed purchase price and to execute an APA on the same or better terms than the APA, with a minimum overbid of $100,000. In the event of a transaction consummated with a party other than the Stalking Horse Purchaser, the Debtor has agreed to a break-up fee equal to four percent (4%) of the Stalking Horse Purchaser's highest bid. If there are no other qualified bidders, then the Auction will be cancelled; on the other hand, if there are multiple qualified bidders, then the Debtor may also elect to lock in a backup bidder in the event the successful bidder does not close. At the Auction, bid increments after the initial overbid will be $50,000.

41. In connection with the Bid Procedures and executory contract procedures, the Debtor proposes the following timeline:

| Bid Procedures Deadlines | |
|---|---|
| **July 25, 2025** | Deadline to submit Bid to be considered for the Auction |
| **July 26, 2025** | Advise bidders of any Qualified Bids |
| **July 28, 2025 at 9:30 a.m.** | Proposed date of the Auction |
| **July 28, 2025** | Debtor to file a Notice of Successful Bidder at the conclusion of the Auction. |
| **July 29, 2025** | Deadline to file and serve objection to the Sale Motion |
| **July 30, 2025 at 9:30 a.m.** | Sale Hearing (or soonest date thereafter) |

42. The Debtor submits that the proposed Bid Procedures and Bid Procedures Deadlines are fair and reasonable and serve the dual goals of efficiently disposing of the assets to maximize their value, while also marketing the assets of the Debtor to achieve the highest and best price for them. Accordingly, the Debtor requests that the Court enter an order permitting the Debtor to run a sale and auction process in accordance with the Bid Procedures.

Executed on July 11, 2025

By: _____
Pete Vanderveen
Turnaround Officer
Classic Recreations – Texas, LLC